Sol TABOR et al., Appellants,

v.

**JOINT BOARD FOR the ENROLLMENT
OF ACTUARIES et al.**

No. 76–1947.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1977.

Decided July 22, 1977.

Solaman G. Lippman, Washington, D. C., with whom Thomas J. Hart, Washington, D. C., was on the brief, for appellants.

John K. Villa, Atty., Dept. of Justice, Washington, D. C., with whom Irving Jaffe, Acting Asst. Atty. Gen., Washington, D. C., at the time the brief was filed, Earl J. Silbert, U. S. Atty., and Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

BAZELON, Chief Judge:

This appeal involves regulations promulgated by the Joint Board for Enrollment of Actuaries (Board) that implement section 3042 of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S. C.A. § 1242 (1975). Appellants, experienced actuaries adversely affected by the regulations, brought a class action[1] to restrain implementation of the regulations. 20 C.F.R. § 901.12. The district court granted the appellee Board's motion for summary judgment.[2] On this appeal, appellants continue to press many of the substantive and procedural arguments that were rejected below. Although most of these arguments

---

1. The size of the class is unclear. Evidently, there are somewhere between 500 and 1500 class members.

2. The district court did not write an opinion, unfortunately.

lack merit, a remand is required because the Board failed to comply with the Administrative Procedure Act in adopting the regulations.

## I.  BACKGROUND

ERISA is a comprehensive statutory program designed to protect the pension rights of private employees from a variety of abuses.  29 U.S.C. § 1001.  Section 3042 reflects Congress' determination that only competent actuaries should be permitted to service private pension plans.  To this end, Congress directed the Secretaries of Labor and the Treasury to establish a Joint Board that would superintend a process of certifying actuaries for competence.

Congress did not, however, definitively list the standards to be employed by the Board.  Section 3042 empowers the Board to establish "reasonable qualifications" for certification and states that those qualifications "shall include" certain specified requirements.[3]  The standards for individuals applying for enrollment after December 31, 1975 (post-1975 or new applicants) "shall include" educational training in actuarial mathematics and an appropriate period of responsible experience.  The minimum educational requirement is met by a degree in actuarial mathematics or its equivalent from an accredited college or university, or successful completion of an examination.  The minimal possible standards for individuals applying before the end of 1975 (pre-

1976 or experienced applicants) are less rigorous.  Those standards need only include an appropriate period of responsible actuarial experience relating to pension plans.  Nothing in the language or the history of § 3042 suggests what additional requirements, if any, would be appropriate.

The Board was duly constituted in February 1975 and in March of that year invited public comment on implementing the statute.  40 Fed.Reg. 11918.  Following issuance of proposed rules, additional comments were invited.  40 Fed.Reg. 20326.  A hearing was held on June 2, 1975.  On August 27, 1975, the Board withdrew a substantial portion of the initial proposed rules in deference to widespread criticism.  On the same date, a second set of proposed rules was issued which was to operate as temporary rules.  40 Fed.Reg. 38147.  Again, comments were invited and a hearing was scheduled for November 24, 1975.  On October 21, 1975, before the hearing was held, appellants brought this law suit challenging the then temporary regulations.  Those regulations were adopted as final on January 14, 1976, without substantial alteration.

█  The regulatory standards for experienced actuaries are substantially more rigorous than those set out in the statute.  In fact, the regulatory requirements for experienced actuaries are substantially the same as those statutorily mandated for the new applicant group.[4]  Under the regulations, experience is not the sole criteria.  In addi-

---

**3.**  Section 3042, in pertinent part, states,

The Joint Board shall, by regulations, establish reasonable standards and qualifications for persons performing actuarial services with respect to plans to which this Act applies and, upon application by any individual, shall enroll such individual if the Joint Board finds that such individual satisfies such standards and qualifications.  With respect to individuals applying for enrollment before January 1, 1976, such standards and qualifications shall include a requirement for an appropriate period of responsible actuarial experience relating to pension plans.  With respect to individuals applying for enrollment on or after January 1, 1976, such standards and qualifications shall include—

(1) education and training in actuarial mathematics and methodology, as evidenced by—

(A) a degree in actuarial mathematics or its equivalent from an accredited college or university,

(B) successful completion of an examination in actuarial mathematics and methodology to be given by the Joint Board, or

(C) successful completion of other actuarial examinations deemed adequate by the Joint Board, and

(2) an appropriate period of responsible actuarial experience.

**4.**  The lengthy regulations are codified at 20 C.F.R. § 901.12.  The government does not dispute appellants' assertion that the pre-1976 regulatory requirements are substantially the same as the post-1975 statutory requirements.

tion, experienced actuaries must either pass a Board exam,[5] obtain membership by proctored examination in a national actuarial society, or possess a bachelor's or higher degree from a program geared to actuarial science or mathematics.[6] The post-1975 regulations are also somewhat more rigorous than the minimum statutory requirements, requiring, for example, satisfaction of a formal educational requirement and successful completion of an exam or successful completion of two exams. The Board did not prepare a contemporaneous explanation of the basis and purpose of these regulations. It did append a "statement of reasons" to its motion to dismiss appellants' complaint filed March 9, 1976. This statement has never been made available for public consideration.

## II. STATUTORY REQUIREMENTS

■ Appellants argue that the rigorous requirements for experienced applicants vi-

olate ERISA in several respects.[7] They read § 3042 as a "grandfather" clause for experienced applicants, under which the Board must enroll all actuaries with "an appropriate period of responsible actuarial experience relating to pension funds." App.Br. at 24–25. The force of this argument stems from the fact that there are several statutory requirements for new applicants, while experience is the only one for experienced applicants.

The short answer to this argument is that by its terms § 3042 does not grandfather actuaries solely on experience. That section provides that the enrollment requirements "shall include" experience. It follows that the Board may impose enrollment requirements in addition to experience. Nothing in the legislative history is to the contrary.[8] However, as explained in Section III, the Board has not provided a reliable explanation of the basis and purpose of

---

5. Appellants claim that the Board has unlawfully delegated its authority by permitting membership in a private actuarial association to substitute for passing its exam. An agency, appellants assert, "cannot delegate any of its responsibility . . . without express statutory authority." App.Br. at 51. As a factual matter, the Board has not substantially delegated its responsibility to set and administer enrollment standards. Permitting association members to short-cut the regular certification process does not mean that the Board has delegated its control over that process. Each applicant can obtain certification through a process superintended by the Board in every respect. And there is no claim that the Board has set the pass rate for its exam at such a high level that, in practice, the private associations actually set the enrollment standards.

In any event, appellants are incorrect in asserting that express statutory authority is necessarily required for delegation by an agency. Appellants rely on *Cudahy Packing Co. v. Holland,* 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895 (1942) and *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), where delegations by an agency were held to be unlawful. But in both cases the Court found that Congress had clearly expressed its intent that no delegation by the agency was to be permitted. 315 U.S. at 362 n. 3, 62 S.Ct. 651; 416 U.S. at 512–523, 94 S.Ct. 1820. And see *Fleming v. Mohawk Co.,* 331 U.S. 111, esp. at 120–121, 67 S.Ct. 1129, 91 L.Ed. 1375; and *Rasulis v. Weinberger,* 502 F.2d 1006, 1010 (7th Cir. 1974). Congress has evidenced no such intent here. In fact, Congress granted the Joint

Board discretion to "establish reasonable standards and qualifications . . ." for certification of competence. 29 U.S.C. § 1242(a).

6. Three examinations have been administered by the Board, with pass rates as follows:

October 31, 1975, 32%
February 2, 1976, 27%
April 2, 1976, 40%

7. Because a remand is necessary in any event, see Section III, *infra,* it could be argued that we should not reach these issues. There are two reasons why we do so. First, these arguments have been pressed vigorously throughout the entire course of proceedings and will in all likelihood continue to be pressed if not resolved now. It is, therefore, in the interests of economy to resolve them now. Furthermore, our conclusions regarding the range of discretion enjoyed by the Board supports our conclusion regarding the Board's failure to comply with the APA. We do not, however, now pass on issues that involve the exercise of the Board's discretion.

8. Appellants claim that by rejecting earlier versions of section 3042 providing that all actuaries must possess a degree or successfully complete an exam, Congress made clear its intent that experienced actuaries were not to have to meet substantive requirements in addition to experience. We disagree. Congress' rejection of these proposals, when read against the statutory text, at most signifies that the Board need not impose additional requirements.

the additional requirements it imposed. Consequently, their reasonableness cannot now be ascertained.

▮ Appellants also claim that Congress intended the Board to provide for a "two-tier" method of enrollment under which less stringent requirements would be required to service small plans. The statute does not expressly require such an enrollment practice. Appellants, however, rely on legislative history, in particular a Report of the Ways and Means Committee on H.R. 12855 (H.Rep.No.93–807, 93rd Cong., 2d Sess.), the bill from which the language of Section 3042 was derived.

> In formulating enrollment regulations (including regulations relating to applications for enrollment after 1975), it is your committee's intent that the Secretary recognize *to the extent feasible* the varying degrees of actuarial skill required in the examination of different types of plans. . . . The limited number of persons with a high level of actuarial skills makes it desirable that the standards acceptable for those examining small and simpler

plans not be as restrictive as in the case of those examining the larger plans. (Emphasis added.)

*See also* House Senate Conference Committee Report, H.Rep.93–1280 93rd Cong., 2d Sess. (1974). Although this history would support a two-tier system, it does not mandate one. But since the Board has not provided an explanation of why such a system is not "feasible," we cannot now review its decision.[9]

## III. COMPLIANCE WITH THE ADMINISTRATIVE PROCEDURE ACT

▮ The rules in this case were adopted pursuant to notice-and-comment rulemaking, section 4(b) of the APA, 5 U.S.C. § 553(c). That section requires the adopting agency to "incorporate in the rules adopted a concise general statement of their basis and purpose." The Board published no such statement with the rules. The Board did append an unpublished "statement of reasons" to its motion to dismiss. But, as appellants point out, agen-

---

**9.** It also is argued that the pre-1976 regulations constitute an unconstitutional irrebuttable presumption in that each experienced applicant is not provided an individual hearing in which to demonstrate competence. Appellants insist that a series of Supreme Court cases preclude the Joint Board from enrolling only those who either possess a degree, belong to a private actuarial association, or have successfully completed an examination; *Stanley v. Illinois*; 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *United States v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Cleveland Bd. of Ed. v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

In response the Board first argued broadly that the recent Supreme Court decision in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1976), undermined, if not overruled, the irrebuttable presumption doctrine. This is a difficult argument to evaluate. On the one hand, the *Salfi* Court expressly reaffirmed the earlier decisions but found them not controlling. On the other hand, there is language in *Salfi* which, if applied literally, might logically require abandonment of the Court's earlier decisions. Nevertheless, we need not determine the vitality of the doctrine in general for we find that the doctrine has not been violated in this case.

Appellants explain at great length why government may not, when first regulating a profession, refuse to license those experienced in the profession simply because they neither possess a degree nor belong to a responsible private association. In *Berger v. Board of Psychologist Examiners*, 172 U.S.App.D.C. 396, 521 F.2d 1056 (1975), we held that when the District of Columbia government first decided to license psychologists, it could not deny licenses to experienced psychologists who did not possess graduate degrees. Due process prohibited irrebuttably presuming that psychologists without such degrees are incompetent. Consequently, the licensing board was ordered to administer examinations to those experienced psychologists who desired to be licensed.

Thus, the critical question here is whether the procedures *Berger* implicitly held to be adequate in an analogous context—examinations—in fact violate due process. Unfortunately, appellants devote very little attention to this point. They simply claim that because the examinations "create . . . an improper irrebuttable presumption" because they are the *only* means of enrollment available to certain people. Appellant's brief at 43. An exclusive procedure is not necessarily unconstitutional. More importantly, appellants have not demonstrated that examinations deny individual applicants a reasonable opportunity to demonstrate competence.

cy action cannot be sustained on *post hoc* rationalizations supplied during judicial review. *See e. g., SEC v. Chenery,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942) (*Chenery I*); 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1946) (*Chenery II*); and *KIRO v. FCC,* 178 U.S.App.D.C. 126, 130, 545 F.2d 204, 208 (1976).

We cannot agree with the Board's assertion that *Chenery* applies only to agency adjudications and therefore does not apply to informal rulemaking. First of all, under this theory, regulations would be affirmed whenever the reviewing court could divine a reasonable explanation for their adoption; an agency would have no reason to comply with § 4(b). Furthermore, the principles that underlie *Chenery* apply forcefully to informal rulemaking.

> If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.

318 U.S. at 88, 63 S.Ct. at 459. A rule no less, and perhaps more, than an order depends upon a "determination of policy or judgment which the agency alone is authorized to make . . . ." Finally, nothing in *Chenery* or subsequent cases suggests it applies only to adjudications.[10] *Chenery* has been relied on by the Supreme Court in contexts other than adjudications,[11] and has been cited favorably in informal rulemaking cases.[12]

Apart from disputing the applicability of *Chenery,* the Board also disputes how it should be applied. The Board insists that a statement of reasons filed with the district court during litigation satisfies § 4(b). Although some authority supports this position, we hold that the statement of reasons filed with the district court does not substantially comply with § 4(b) and is an inadequate basis for judicial review.

Section 4(b) has not been interpreted technically, in recognition of its limited purpose. *Alabama Ass'n of Insurance Agents v. Bd. of Governors,* 533 F.2d 224 (5th Cir. 1976). Section 4(b) is merely designed to enable the reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." *Automotive Parts & Accessories Association v. Boyd,* 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). Consequently, statements of less than ideal clarity have been held to be sufficient, *New York Freight · Forw'rs & Brokers Ass'n v. Federal Maritime Comm'n,* 337 F.2d 289 (2d Cir. 1964), *cert. denied,* 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965). And, on occasion, regulations with no statement of purpose have been upheld where the agency's purpose was considered obvious and unmistakable. *Alabama Ass'n of Insurance Agents, supra.*

On the other hand, in *Automotive Parts, supra,* our court warned agencies against reading the adjectives "concise" and "general" over-literally, 132 U.S.App.D.C. at 208, 407 F.2d at 338. And in *Rodway v. United States Dept. of Agriculture,* 168 U.S.App.D.C. 387, 514 F.2d 809 (1975), a

---

**10.** In *Chenery II,* the Supreme Court emphasized that *Chenery I* established a general rule of administrative law:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with *a determination or judgment* which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.

332 U.S. at 196, 67 S.Ct. at 1577 (emphasis added).

**11.** *See, e. g., Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1972) (informal action that was neither rulemaking nor adjudication); and *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1972) (ratemaking).

**12.** *Kennecott Copper Corp. v. EPA,* 149 U.S.App.D.C. 231, 234, 462 F.2d 846, 849 (1972).

panel of this court refused to affirm regulations not accompanied by a § 4(b) statement rejecting the agency's contention that explanations of agency officials submitted in affidavit form during litigation were an adequate substitute.[13] The panel found "no reason to depart from the well-settled rule that litigation affidavits are an unacceptable basis for appellate review of agency decision-making." At 395, 514 F.2d at 817. The case was remanded to the district court "with instructions to return it to the Secretary for a new rulemaking proceeding." *Id.* at 402, 514 F.2d at 824.

It is not only the potential unreliability of litigation documents that makes them unacceptable. In addition, as appellants point out, the Board's failure to publish a contemporaneous statement of basis and purpose made it practically impossible to file an intelligent petition for reconsideration. As a result, appellants lost a method of challenge less expensive and time-consuming than judicial review; the Board lost an early opportunity to be apprised of and to

correct any errors it might have made. *See generally* 5 U.S.C. § 553(e). "Each agency shall give an interested person the right to petition for repeal of a rule."

■ Under *Rodway*, the proper course here would be to vacate the rules and remand the case to the Board to enable it to adopt regulations accompanied by a sufficient statement.[14] The Second Circuit, however, follows a different procedure, which the Board asks us to follow. In *National Foods Ass'n v. Weinberger*, 512 F.2d 688 (1975),[15] the agency's statement of purpose was found to be inadequate for review. The court did not vacate the regulations and remanded for further proceedings. Instead, it said,

> the remedy under these circumstances is 'to obtain from the agency, either through affidavits or testimony such additional explanation of the reasons for the agency decision as may prove necessary.' *Citing Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)

13. The Board tries to limit *Rodway* by claiming that a remand was ordered because the lack of findings was "intertwined" with a failure to give notice, also required by 5 U.S.C. § 553. However, the *Rodway* court clearly regarded each of these defects as an independent basis for reversal. The court stated that litigation affidavits, as *post hoc* rationalizations, "are unacceptable substitutes for a contemporaneous basis and purpose statement." At 395, 514 F.2d at 817.

14. In *Rodway* it was necessary to order an entirely new rulemaking proceeding because the regulations were tainted by inadequate notice in addition to a failure to give reasons. Here, on the other hand, the only defect complained of is the failure to give reasons. Consequently, the Board's error can be adequately remedied by a remand that will enable it to adopt rules accompanied by a contemporaneous § 4(b) statement.

At argument, the Board appeared to abandon its argument that its statement of reasons could support review as a *post hoc* rationalization. Instead, the Board argued for the first time that this statement, filed with the district court roughly half a year after publication of the temporary rules and ten weeks after publication of the final rules, was in fact intended to be a contemporaneous basis and purpose statement. The Board suggests that it is only because appellants brought suit so quickly that

the statement does not appear to be contemporaneous. Nothing in the record, including the statement of reasons itself, indicates that the statement was anything but a litigation document. Indeed, the statement never has been made available for public consideration. Section 4(b) provides that the statement of "basis and purpose" shall be incorporated "in the rules." Since rules must be published, § 4(d), a statement of "basis and purpose" can be "incorporated in the rules" only if it too is published.

We do not mean to suggest, however, that a § 4(b) statement must be published at precisely the same moment as the regulations. The agency must be allowed some latitude for technical difficulties. The enquiry must be whether the rules and statement are published close enough together in time so that there is no doubt that the statement accompanies, rather than rationalizes the rules.

15. The Board cited two other cases for the proposition that a basis and purpose statement can be satisfied by litigation testimony, *Kennecott Copper v. EPA*, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972), and *Greater New York Hospital Ass'n v. Mathews*, 404 F.Supp. 320, 323 (S.D.N.Y., 1975). *Kennecott Copper* is discussed in text, *see* text following note—*infra*, and in *Mathews* a district court in the Second Circuit merely followed *Weinberger*.

and *Kennecott Copper Corp. v. EPA*, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972). Id. at 701. For the reasons expressed below, we adhere to *Rodway*.

█ As indicated, the Second Circuit relied primarily on *Camp v. Pitts, supra*. In that case, which was one of informal action rather than rulemaking and hence not governed by § 4(b), 411 U.S. at 141, n. 3, 93 S.Ct. 1241, the Supreme Court essentially applied principles developed in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1972), *see* 411 U.S. at 141–43, 93 S.Ct. 1241. Consequently, it is necessary to look to *Overton Park* to evaluate the Second Circuit's reliance on *Camp v. Pitts*.

At issue in *Overton Park* was informal action taken under a statute prohibiting the Secretary of Transportation from taking certain steps if a "feasible and prudent" alternative exists. The Secretary took the steps without making formal findings regarding the existence of alternatives. After concluding that the lack of findings precluded affirmance, the Supreme Court decided not to vacate the Secretary's action. Instead, the case was remanded to the district court for it to establish by testimony from agency officials the basis of the Secretary's decision, and then review the sufficiency of the reasons adduced.

*Overton Park* does not establish, however, that § 4(b) of the APA can be satisfied by testimony or affidavits submitted to the district court. In *Overton Park*, no statute required the Secretary to make formal findings, and the Court recognized that it ordinarily cannot order such findings to be made in the absence of a statute. 401 U.S. at 417, 91 S.Ct. 814.[16] Hence, although aware that taking testimony of agency offi-

cials in the district court is generally to be avoided, *citing United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), and that *post hoc* rationalizations are generally regarded as an inadequate basis for review, *citing Chenery*, the Court concluded that such a course was the "only way there can be effective judicial review." *Id.* at 420, 91 S.Ct. at 825. Here, on the other hand, effective judicial review can be accomplished by enforcing § 4(b). In fact, where a statute mandates formal findings, *Overton Park* indicates that "the proper course would be to remand the case to the District Court directing that court to order the Secretary to make formal findings." 401 U.S. at 419, n. 33, 91 S.Ct. at 825. Nothing in *Kennecott Copper* is to the contrary. There the court concluded that the necessities of judicial review required the agency to supply a fuller statement than mandated by § 4(b). Since the agency had complied fully with the APA, the court remanded the record to the agency for a fuller statement without vacating the rules, 149 U.S.App.D.C. at 235–236, 462 F.2d at 850–51.[17]

Consequently, we adhere to *Rodway* by refusing to review the Board's regulations on the basis of *post hoc* rationalizations. The rules must be vacated and the case remanded to the Board to enable it to adopt new rules accompanied by a contemporaneous statement of basis and purpose.

*It is so ordered.*

---

16. "[T]he Administrative Procedure Act requirements that there be formal findings in certain rulemaking and adjudicatory proceedings do not apply to the Secretary's action here." 401 U.S. at 417, 91 S.Ct. at 824 (citations omitted).

17. Finally, the Board's regulations cannot be reviewed without a § 4(b) statement as in *Alabama Ass'n of Insurance Agents v. Bd. of Governors*, 533 F.2d 224, 236–37 (5th Cir. 1976), on

the ground that their basis and purpose are unmistakable. Regulations should rarely, if ever, be reviewed in this manner because of the difficulty in making the necessary determination accurately. In any event, here there is no way to know, for example, why the Board imposed the additional enrollment requirements that it did or why it concluded that a two-tier program was not at all feasible.